# In the United States Court of Federal Claims

No. 07-14 L
(Filed: May 12, 2008)

*************************************

| | |
|---|---|
| THE RICHARD A. FORSGREN         * | |
| REVOCABLE LIVING FAMILY         * | |
| PRESERVATION TRUST: CLAYTA       * | |
| FORSGREN, RICHARD A. FORSGREN,   * | |
| RICHARD E. FORSGREN, TERRI LYNN   * | RCFC 12(b)(1); Statute of Limitations, 28 |
| HAGER, and BARBARA ANN           * | U.S.C. § 2501; <u>John R. Sand & Gravel Co.</u>; |
| THOMPSON, TRUSTEES,            * | Fifth Amendment Taking; Continuing |
|                    * | Claims Doctrine; Stabilization; |
|         Plaintiff,       * | Remediation; <u>Fisher</u>; <u>Moden</u>; <u>Jan's</u> |
|                    * | <u>Helicopter Service, Inc.</u> |
| v.                      * | |
|                    * | |
| THE UNITED STATES,           * | |
|                    * | |
|         Defendant.     * | |

*************************************

<u>Karen Budd-Falen</u>, Cheyenne, Wyoming, for plaintiff.

<u>Bruce K. Trauben</u>, United States Department of Justice, Washington, DC, for defendant.

### OPINION AND ORDER

**SWEENEY**, Judge

Before the court in this Fifth Amendment takings case are defendant's motion to dismiss plaintiff's complaint for lack of jurisdiction and plaintiff's motion to voluntarily dismiss its first claim for relief. In its complaint, plaintiff alleges that the government's reconstruction of certain ponds on federal land caused its nearby property to flood, that the flooding did not recede until the government installed a subsurface drain, and that due to the government's failure to maintain the subsurface drain for several years, the drain failed and caused additional flooding on its property. Based on these allegations, plaintiff asserts two takings: one caused by the original flooding, and the other caused by the failure of the subsurface drain. Defendant argues in its motion that both claims run afoul of the statute of limitations and that the second claim does not allege a Fifth Amendment taking over which this court has jurisdiction. After defendant filed its motion, plaintiff withdrew its first takings claim based on newly decided binding precedent. The court construes plaintiff's statement of withdrawal as a motion for voluntary dismissal. For the reasons set forth below, the court grants plaintiff's motion for voluntary dismissal, denies as

moot defendant's motion with respect to plaintiff's first takings claim, and denies defendant's motion with respect to plaintiff's second takings claim.

## I. BACKGROUND[1]

In 1933, the Civilian Conservation Corps ("CCC") constructed a series of ponds on land managed by the Bureau of Land Management near Pinedale, Wyoming.  Compl. ¶ 14.  The CCC built the ponds to raise fish and to serve as a reservoir for irrigation projects.  Id.  In 1944, an irrigation canal was rerouted, eliminating the main source of water to the ponds.  Id. ¶ 15.  Many years later, in January 1966, Clayta and Richard Forsgren ("the Forsgrens") purchased property that was located approximately 1,000 feet from the ponds.  Id. ¶ 16.  The Forsgrens eventually transferred the property in 1991 to the Richard A. Forsgren Revocable Living Family Preservation Trust ("Forsgren Family Trust").  Id.

When the Forsgrens purchased the property, it was undeveloped and contained no standing water.  Id. ¶ 17.  Between the time of the purchase and 1971, the Forsgrens maintained a travel trailer on the property and at no time observed any excessive water on the property.  Id. ¶ 22.  The Forsgrens built a house on the property in 1971.  Id. ¶¶ 20, 22.  They also landscaped the property by bringing in topsoil and planting a lawn, trees, and flowers.  Id. ¶ 21.  Plaintiff alleges that, between 1971 and 1995, the Forsgrens did not experience flooding or ice accumulation on their property.  Id. ¶ 23.

In 1993, various local, state, and federal government entities began to discuss the feasibility of recharging the ponds.  Id. ¶ 24.  During these discussions, Mr. Forsgren raised concerns about seepage that might occur if the ponds were reconstituted.  Id. ¶ 25.  Thus, the government entities arranged for the placement of three monitoring wells on or near the Forsgrens' property.  Id.

The reconstruction and recharging of the ponds were completed in the spring of 1995.  Id. ¶ 31.  On September 27, 1995, Mr. Forsgren reported water problems on his property.  Id. ¶ 32.  As a result, the responsible government entities resolved to increase the monitoring of the wells previously installed on and near the Forsgrens' property.  Id.  In addition, a geologist visited and evaluated the Forsgrens' property.  Id. ¶ 33.  The geologist suggested that the ponds could be the source of the water problems.  Id.  However, despite the construction of a surface ditch, the Forsgrens continued to experience flooding and ice accumulation on their property.  Id. ¶¶ 38-53.

---

[1] The court derives the factual and procedural history in this section from plaintiff's complaint ("Compl."); the exhibit attached to defendant's motion ("Def.'s Ex."); and the appendix submitted with plaintiff's opposition ("Pl.'s App.").  The court derives additional procedural history from the complaint filed in this court on July 27, 2004 ("2004 Compl.") and prior court decisions concerning the same subject matter.  The exhibit attached to defendant's motion was not paginated; thus, the court identifies the individual pages by the numbers assigned by the court's Case Management/Electronic Case Filing system.

The flooding and ice accumulation caused significant damage to the Forsgrens' house.  Id. ¶¶ 47, 51-52, 57, 62-63.

Ultimately, a subsurface drain was constructed on federal land in November 1999.  Id. ¶¶ 55-56, 59.  From 1999 until the late fall of 2005, the drain appeared to be working properly, and the Forsgrens' property began to dry out.  Id. ¶ 58.  In 2005, allegedly due to a failure of the responsible government entities to conduct necessary maintenance, the subsurface drain stopped functioning and water began to accumulate on the Forsgrens' property.  Id. ¶¶ 60-61.  According to plaintiff, the government had represented that it would maintain the drain.  See id. ¶ 55 ("[B]oth federal agencies agreed to participate in the implementation, monitoring, and maintenance of the drain project."); Pl.'s App. 77 (noting that the "Proposed Action Title/Type" was "[t]o construct, operate, and maintain, and terminate a water pipeline and ditch"); cf. id. at 78 (noting that if the subsurface drain project was approved, "a memorandum regarding the maintenance and responsibilities of all parties involved will be drawn up").

On July 28, 2003, prior to the failure of the subsurface drain, Mrs. Forsgren and the Forsgren Family Trust filed a complaint in the United States District Court for the District of Wyoming ("district court") alleging that the reconstitution of the ponds caused "significant deterioration and damages" to the Forsgrens' property.  Compl. ¶ 65; Def.'s Ex. 6, 8-9.  The named defendants in the district court action included components of the United States Department of the Interior and the United States Department of Agriculture.  Def.'s Ex. 6-7.  The complaint contained four claims for relief: trespass, deprivation of property without due process pursuant to 42 U.S.C. § 1983, fraud and misrepresentation, and punitive damages.  Id. at 9-13.  The complaint's prayer for relief requested "damages as allowed by law" and "other relief that is just and proper."  Id. at 14.  The complaint was not served on defendants.  Compl. ¶ 66.  Shortly after the complaint was filed, Mrs. Forsgren and the Forsgren Family Trust became aware that their attorney "was not pursuing their case and was, in fact, misleading [them] about the status of the case."  Id.  As a result, they contacted their attorney "to request that he dismiss his complaint," and contacted a new attorney, who currently represents them.  Id. ¶ 67.  The original attorney did not dismiss the complaint.  Id.

Indeed, the district court's docket reflects that, subsequent to the filing of the complaint, none of the parties to the case took any further action.  Docket of Forsgren v. Bd. of County Comm'rs, No. CJ-2004-630 (filed Nov. 19, 2004) ("Dist. Court Docket"); see also Compl. ¶ 66 (noting that the complaint was not served on defendants).  Eventually, on February 18, 2004, the district court issued a Notice of Impending Dismissal pursuant to Local Rule 41.1(b),[2] indicating

---

[2]  Local Rule 41.1(b) of the United States District Court for the District of Wyoming, which has been in effect since at least November 30, 1996, and expands upon Rule 41(b) of the Federal Rules of Civil Procedure, provides:

> Dismissal for Lack of Prosecution.  If no action has been taken in any case
> by a party for three (3) months or the case is not at issue by that time, the Court

that the case would be dismissed as a result of inaction over a three-month period.  Compl. ¶ 68; Dist. Court Docket.  The district court issued an order dismissing the case with prejudice for failure to prosecute on August 16, 2004.  Compl. ¶ 69; Dist. Court Docket.

Meanwhile, on July 27, 2004–less than three weeks before the dismissal of the district court complaint–the trustees of the Forsgren Family Trust ("trustees") filed a complaint in this court ("the 2004 complaint"), alleging that the government's reconstruction of the ponds near their property caused a temporary taking via a water flowage easement.  Compl. ¶ 70; 2004 Compl. ¶ 1.  The 2004 complaint contained one claim for relief–a Fifth Amendment taking. 2004 Compl. ¶¶ 65-86.  In their prayer for relief, the trustees requested a declaratory judgment, monetary damages, injunctive relief, costs, and "such other and further relief as the Court deems just and proper."  2004 Compl. Requests Relief ¶¶ A-E.

On October 25, 2004, defendant filed a motion to dismiss the 2004 complaint for lack of jurisdiction, arguing, in relevant part, that the trustees filed the 2004 complaint after the expiration of the six-year limitations period set forth in 28 U.S.C. § 2501 (2000).  Forsgren v. United States, 64 Fed. Cl. 456, 457-58 (2005) ("Forsgren I").  Chief Judge Edward J. Damich ruled on defendant's motion on March 21, 2005,[3] finding that the trustees' Fifth Amendment takings claim accrued in 1999, when they could have "reasonably foreseen the extent of the damage to their property" and arrived at a "final account."  Id. at 459 (quotation & citations omitted).  Further, the Chief Judge found that it would be unfair to the trustees to charge them "with foreseeing the extent of their damages, when an expanse of their lawn, including the area immediately surrounding their house, was still under water or ice."  Id.  Then, in dicta, the Chief Judge noted that even if the trustees were able to foresee the damage to their property prior to July 1998, "the government's attempts to repair the damage to Plaintiffs' land caused the date of accrual to be uncertain."  Id.

Subsequent to the Chief Judge's ruling, the parties engaged in discovery.  During a November 18, 2005 telephone conversation, the parties discussed newly discovered evidence concerning the causation and accrual date of the trustees' claims, as well as the pendency of the

---

shall direct the Clerk of Court to notify counsel of record, or the parties if their addresses are known, and if they are not represented by counsel of record, by certified mail return receipt requested, that said case shall be dismissed for lack of prosecution thirty (30) days from the date of said notice.  If no action is taken within said thirty (30) days after such notice has been given, the Court may, in its discretion, enter the order of dismissal.  Said order shall be mailed to counsel of record or to the parties.

See Local Rules–Civil, http://www.wyd.uscourts.gov/pdfforms/localrules-cv.pdf (last updated Mar. 1, 2005).

[3] The case was transferred to the undersigned on January 9, 2006.

district court action at the time the 2004 complaint was filed. Def.'s Ex. A. That same day, defendant memorialized the contents of the telephone conversation in a letter to opposing counsel. Id. About five months later, defendant filed a motion to dismiss for lack of jurisdiction, or in the alternative, for summary judgment, asserting that the court lacked jurisdiction over the 2004 complaint pursuant to 28 U.S.C. § 1500 (2000),[4] and that new evidence indicated that the 2004 complaint was precluded by the statute of limitations. Forsgren v. United States, 73 Fed. Cl. 135, 138 (2006) ("Forsgren II"), amended by 74 Fed. Cl. 422 (2006) ("Forsgren III").

On September 27, 2006, the undersigned ruled on defendant's motion. Id. at 135-36. Because the complaint filed by Mrs. Forsgren and the Forsgren Family Trust in the district court arose from the same operative facts and sought the same relief as the pending 2004 complaint, the court found that it lacked jurisdiction pursuant to 28 U.S.C. § 1500. Id. at 139-40, 143-44. Further, in dicta, the court addressed defendant's argument that new evidence necessitated the re-evaluation of the accrual date of the trustees' claim, stating that the new evidence did not affect the accrual date found by the Chief Judge. Id. at 143-44. The court dismissed the 2004 complaint with prejudice. Id. at 144.

The trustees then filed a motion for reconsideration on October 12, 2006. The sole basis for the trustees' motion was their contention that the court should have dismissed their complaint without prejudice. Forsgren III, 74 Fed. Cl. at 423. The trustees' motion was meritorious; complaints dismissed for lack of subject matter jurisdiction are dismissed without prejudice. Aerolineas Argentinas v. United States, 77 F.3d 1564, 1572 (Fed. Cir. 1996). Thus, the court granted the trustees' motion, Forsgren III, 74 Fed. Cl. at 425-26, leaving the door open for the trustees to return to this court if circumstances so warranted.

The Forsgren Family Trust filed the instant complaint on January 10, 2007, asserting two claims for relief. First, plaintiff alleges a Fifth Amendment taking as a result of the flooding caused by the reconstruction of the CCC ponds, and requests that the court toll the statute of limitations with respect to this claim. Compl. ¶¶ 82-97. Plaintiff then alleges a separate Fifth Amendment taking resulting from the flooding caused by the government's alleged failure to maintain the subsurface drain. Id. ¶¶ 98-105. Plaintiff seeks monetary damages for the alleged takings. Compl. Requests Relief ¶ A.

Defendant's instant motion seeks dismissal of plaintiff's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), asserting that this court does not have jurisdiction over plaintiff's Fifth Amendment takings claims because both of plaintiff's claims are time-barred pursuant to 28 U.S.C. § 2501, and because plaintiff's second claim for relief does not present facts sufficient to support a Fifth Amendment taking. Def.'s Mot. Dismiss Lack Jurisdiction ("Mot.") 1-2.

---

[4] Section 1500 provides, in relevant part: "The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States . . . ."

After briefing had concluded, but before the court ruled on defendant's motion, the United States Supreme Court ("Supreme Court") issued its decision in John R. Sand & Gravel Co. v. United States, affirming the United States Court of Appeals for the Federal Circuit's ("Federal Circuit") sua sponte dismissal of a complaint pursuant to 28 U.S.C. § 2501. 128 S. Ct. 750, 752-53, 757 (2007). Given the apparent relevance of the Supreme Court's ruling in this matter, the court requested that the parties address the ruling in supplemental briefs. Supplemental briefing concluded on February 21, 2008. The court heard argument on April 30, 2008.

## II.  LEGAL STANDARDS

### A.  RCFC 12(b)(1) Motion to Dismiss

In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974); Reynolds, 846 F.2d at 747. If the court concludes that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B.  Subject Matter Jurisdiction

Whether the court has jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act, the principal statute governing the jurisdiction of this court, provides that the Court of Federal Claims has jurisdiction over claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2000). The Tucker Act is merely a jurisdictional

statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994). Here, plaintiff alleges two takings theories pursuant to the Fifth Amendment of the United States Constitution, clearly a money-mandating constitutional provision. See Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987) (noting that "the 'just compensation' required by the Fifth Amendment has long been recognized to confer upon property owners whose property has been taken for public use the right to recover money damages from the government").

## C. Statute of Limitations

Claims against the United States that are filed in the Court of Federal Claims must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501. The Supreme Court recently held that 28 U.S.C. § 2501 provides an "absolute" limit on the ability of the Court of Federal Claims to reach the merits of a case. John R. Sand & Gravel Co., 128 S. Ct. at 753-54. Further, the Supreme Court held that 28 U.S.C. § 2501 is not subject to equitable tolling. See id. at 756 (concluding that its "definitive earlier interpretation of the statute . . . should offer a sufficient rebuttal" of any presumption in favor of equitable tolling).

## III. DISCUSSION

## A. Plaintiff's First Claim for Relief

Plaintiff alleges, in its first claim for relief, that the government's reconstruction of the CCC ponds caused its property to flood, resulting in a Fifth Amendment taking. Compl. ¶¶ 82-97. Defendant moves to dismiss this claim for lack of subject matter jurisdiction, contending that plaintiff filed its complaint beyond the six-year limitations period set forth in 28 U.S.C. § 2501. Mot. 1-2, 10-16. Initially, plaintiff objected to defendant's characterization of its motion to dismiss, arguing that the statute of limitations is not jurisdictional and, thus, defendant was moving for dismissal for failure to state a claim. Pls.' Resp. Opp'n Def.'s Mot. Dismiss Lack Jurisdiction ("Opp'n") 2-5. Plaintiff further contended that although defendant's assertion that plaintiff's allegations set forth in its first claim for relief "became time-barred after December 31, 2005 is presumably correct," id. at 9 n.1, the court should toll the limitations period for those allegations, id. at 8-14; Compl. ¶ 97. However, in its supplemental brief addressing the implications of the Supreme Court's ruling in John R. Sand & Gravel Co., plaintiff conceded that the ruling requires dismissal of its first claim for relief. See Pls.' Responsive Supplemental Br. ("Pl.'s Feb. Br.") 2-3 ("Plaintiffs concede that the United States Court of Federal Claims lacks jurisdiction to consider 'Claim One' of the Plaintiffs' Complaint."); id. at 4 ("Plaintiffs hereby

withdraw Claim One from the consideration of this Court . . . .").[5]  Because the Supreme Court has concluded that 28 U.S.C. § 2501 cannot be equitably tolled, plaintiff's first claim for relief cannot survive defendant's jurisdictional attack.  The court construes plaintiff's statement of withdrawal as a motion for the voluntary dismissal of its first claim for relief, which the court grants.

### B.  Plaintiff's Second Claim for Relief

In its second claim for relief, plaintiff alleges that defendant's failure to maintain the subsurface drain, as promised, led to the failure of the drain in 2005, causing plaintiff's property to flood and resulting in a second Fifth Amendment taking.  Compl. ¶¶ 98-105.  Defendant advances two reasons why this claim should be dismissed for lack of subject matter jurisdiction.  First, defendant argues that this claim is time-barred because any flooding occurring in 2005 or later is the direct result of the 1995 reconstruction of the CCC ponds, and any claims based on the reconstruction of CCC ponds relate back to 1999.  Mot. 1-2, 16, 18-19.  Defendant also argues that plaintiff's claim does not constitute a Fifth Amendment taking because it is not based on any affirmative government action, id. at 1-2, 16-18, and instead, if anything, constitutes a tort, id. at 2, 17.  Thus, defendant's motion raises two distinct issues.  One, does plaintiff's second claim for relief allege an injury distinct from the injury allegedly caused by the reconstruction of the CCC ponds so as to constitute a separate cause of action for the purposes of the statute of limitations?  Two, if plaintiff's second claim for relief alleges a distinct injury, does that alleged injury constitute a Fifth Amendment taking over which this court has jurisdiction?

### 1.  Plaintiff Has Sufficiently Alleged a Separate Cause of Action That May Have Accrued Within the Six-Year Limitations Period of 28 U.S.C. § 2501

The parties' dispute regarding the statute of limitations centers on whether plaintiff's second claim for relief is legally distinct from its first claim for relief.  If the claims are indistinct, then plaintiff's second claim for relief would not accrue within the six-year limitations period set forth in 28 U.S.C. § 2501.  Defendant argues that because the court has held previously that the reconstruction of the CCC ponds resulted in the clear and permanent taking of plaintiff's property in 1999,[6] and because the government installed the subsurface drain to fix the problems

---

[5]  The instant complaint identifies the plaintiff as the Forsgren Family Trust.  Compl. ¶ 10.  However, in all of plaintiff's subsequently filed briefs, plaintiff is referred to in the plural form, apparently including the trustees as plaintiffs with the Forsgren Family Trust.  Because of the manner in which counsel crafted the complaint, the court refers to the singular plaintiff identified in the complaint; namely, the Forsgren Family Trust.

[6]  "[A] takings claim accrues when 'all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'  Thus, the key date for accrual purposes is the date on which the plaintiff's land has been clearly and

caused by the CCC pond reconstruction, plaintiff's claim that the government failed to maintain the subsurface drain has the same accrual date as the original alleged taking–1999. Id. at 18-19. In essence, defendant argues that plaintiff's second claim for relief flows from the first claim for relief, and thus the claims are indistinguishable because both arose from the same government action. Plaintiff disagrees, arguing that its second, distinct claim for relief accrued in 2005, when the subsurface drain allegedly stopped functioning properly. Compl. ¶ 105; Opp'n 15. Both parties attempt to shoehorn the facts of this case into the analytical framework of the continuing claims doctrine. See Mot. 18; Opp'n 16-19. However, while the Federal Circuit and its predecessor court, the United States Court of Claims ("Court of Claims"), have applied the continuing claims doctrine in pay cases, Wells v. United States, 420 F.3d 1343, 1345-47 (Fed. Cir. 2005); Friedman v. United States, 310 F.2d 381, 384 (Ct. Cl. 1962), the Federal Circuit has explicitly declined to apply the doctrine to environmental takings cases, Boling, 220 F.3d at 1373. Similarly, this court declines to manipulate the continuing claims doctrine to fit the facts of this case.

"The continuing claims doctrine has been applied when the government owes a continuing duty" to a plaintiff. Id. "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1456 (Fed. Cir. 1997). However, it "does not apply in cases where a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial governmental breach." Boling, 220 F.3d at 1373.

Defendant cites three cases in support of its contention that both of plaintiff's takings claims "arise from a single seminal event–the alteration of the CCC Ponds–that constitutes one cause of action for statute of limitations purposes." Mot. 18. The relevant issue in the first cited case, Boling, was whether the continuing claims doctrine applied to a taking by a gradual process–erosion. 220 F.3d at 1373-74. Plaintiffs in Boling argued that "as each additional quantum of land is taken, a new cause of action arises." Id. at 1373. The Federal Circuit disagreed, concluding:

> While erosion is certainly a process that gradually increases the property damage over time, there is only a single governmental act that breaches a duty to the plaintiffs–allowing the erosion from the waterway to substantially encroach the plaintiffs' property. Once this has occurred, the permanence of the taking is manifest, its progressive nature is apparent, and its ultimate extent is reasonably foreseeable. In short, the increased damages that occur as more of the land is eroded are not the result of new and independent breaches by the government, but

permanently taken." Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir. 2000) (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988)).

> are merely the natural and foreseeable consequences of the government's single
> breach.  The continuing claims doctrine is inapplicable in such a situation.

Id. at 1374.  Thus, the Federal Circuit explicitly rejected the application of the continuing claims
doctrine in the erosion context.  Further, defendant fails to recognize that the decision in Boling
is distinguishable on its facts because plaintiff in the instant case, unlike the plaintiffs in Boling,
does not allege that a gradual process of erosion resulted in a Fifth Amendment taking, but
instead that two, distinct takings have occurred.  According to plaintiff, the two takings are
distinct because they are separated by an intervening act by the government–its installation of a
subsurface drain on federal land to remediate the flooding of plaintiff's property.

     In another case cited by defendant, Central Pines Land Co. v. United States, plaintiffs
alleged that the United States, as the owner of the surface rights to certain land, "continued to
impose restrictions and prohibitions on the plaintiffs' access to and use of their" mineral rights in
the same land upon the expiration of a formal moratorium.  61 Fed. Cl. 527, 530, 536-37 (2004).
The government argued that plaintiffs' claims all arose "from a single alleged breach of duty
arising from a fixed point in time" (i.e., the date that the formal moratorium expired), while
plaintiffs argued that there were "numerous wrongful acts" by the government preventing their
access.  Id. at 538-39 (internal quotation marks omitted).  The court cited with approval the law
concerning the continuing claims doctrine set forth in Boling, but held that it was "not in a
position to determine whether or not the continuing claims doctrine should apply to this case
without further development of the facts beyond those contained in the parties' pleadings."  Id. at
539.  Because plaintiffs in Central Pines Land Co. alleged a continuing wrong, the facts are more
similar to those in Boling than those in the instant case, where two, distinct wrongs are alleged.
Moreover, in Central Pines Land Co., there were no allegations that the government attempted to
remedy the alleged harm caused by its actions, as occurred in the instant case.

     Defendant's third citation is to the Supreme Court's decision in United States v. Dow, for
the proposition that "it would certainly be bizarre to hold that there were two different 'takings'
of the same property, with some incidents of the taking determined as of one date and some as of
the other."  357 U.S. 17, 24 (1958).  While defendant accurately quotes the Supreme Court, that
case presented an entirely different fact scenario than that presented here.  In Dow, the United
States obtained, in a condemnation proceeding, a court order permitting its immediate possession
of a strip of land.  Id. at 18-19.  Within the ten days that followed, the United States took physical
possession of the land.  Id. at 19.  Approximately three years later, the United States "filed a
declaration of taking[] under the Declaration of Taking Act" concerning this same land.  Id.
Consequently, the two "different takings" referred to by the Supreme Court were the physical
entry onto the land and the filing of the declaration of taking.  Id. at 23.  Thus, in Dow, there was
only one Fifth Amendment taking, with the dispute being which government act constituted the
taking.  Once again, in the present case, plaintiff is alleging two, distinct takings.

     Plaintiff, for its part, does not dispute the applicability of the continuing claims doctrine
to its claims.  Instead, plaintiff urges a different gloss–that the continuing claims doctrine defeats

the statute of limitations' bar because it sustained two, distinct flooding injuries, each caused by a distinct government appropriation of its property.  Opp'n 16-17; Pl.'s Feb. Br. 3.  What is missing from both parties' arguments is an articulation of a single, unifying "continuing duty" owed to plaintiff by the government that would trigger a continuing claims analysis, see Boling, 220 F.3d at 1373, as well as an explanation of how plaintiff's Fifth Amendment takings claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs," see Brown Park Estates-Fairfield Dev. Co., 127 F.3d at 1456.  Although "[t]he continuing claim doctrine involves a series of distinct events pleaded to the court as a single overall event spanning many years," Applegate v. United States, 25 F.3d 1579, 1583 (Fed. Cir. 1994), in the instant case, plaintiff alleges only two, distinct events–the reconstitution of the CCC ponds and the failure of the subsurface drain–and these events were separated in time by an apparently successful remediation effort by the government–the installation of the subsurface drain.[7]

With respect to the first, distinct event, the Chief Judge has held that any claim arising from the reconstitution of the CCC ponds accrued in 1999 with the installation of the subsurface drain, because the subsurface drain stabilized the condition of plaintiff's property, making the extent of the damage to the property reasonably foreseeable.  Forsgren I, 64 Fed. Cl. at 459 (applying the stabilization rule set forth by the Supreme Court in United States v. Dickinson, 331 U.S. 745, 749 (1947)).  The remediation effectuated by the subsurface drain terminated the government's alleged taking of a flowage easement on plaintiff's property, leaving plaintiff with a claim for a temporary taking.  Id. at 457 (citing the 2004 complaint); see, e.g., Applegate, 25 F.3d at 1582-83 (concluding that the installation of a sand transfer plant, a measure designed to "reverse the continuous erosion process," may have changed the alleged permanent physical taking of plaintiffs' shoreline property into a temporary taking); see also First English Evangelical Lutheran Church of Glendale v. County of L.A., Cal., 482 U.S. 304, 318 (1987) (describing several cases in which the government's wartime appropriation of private property for a specified length of time constituted temporary physical takings); Dow, 357 U.S. at 26 (noting that an abandonment of condemnation proceedings would change a permanent physical taking into a temporary taking); cf. Wyatt v. United States, 271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001) (holding, in the case of a regulatory taking, that "[t]he essential element of a temporary taking is a finite start and end to the taking").  Accordingly, any purported government duty to fix the problems that were allegedly created by the reconstitution of the CCC ponds expired when the government did, in fact, fix the problems by installing the subsurface drain.

For more than five years after the first alleged Fifth Amendment taking ended, plaintiff did not experience any flooding on the property, Compl. ¶ 58, allowing it to regain use of the

---

[7]  Indeed, it is not insignificant that the intervening event that resuscitated the "life" and value of plaintiff's property was the government's honorable decision to install the subsurface drain.  The subsurface drain stanched the flow of water onto plaintiff's property and permitted the property to dry out and return to a usable state.  Thus, the government's remediation efforts bore fruit.

property.  It was not until the malfunction of the subsurface drain that flooding recurred.  Id. ¶ 61.  The only duty alleged by plaintiff to be breached by the government is the alleged duty to maintain the subsurface drain, id. ¶ 55, a duty that necessarily does not relate back to the reconstitution of the CCC ponds.  Further, the failure of the subsurface drain cannot be properly described as one in a series of wrongs.  Thus, a takings claim based on the recurrence of flooding after stabilization and remediation need not be analyzed using the continuing claims doctrine.  See also Applegate, 25 F.3d at 1583 ("This court's application of Dickinson's stabilization rule here does not invoke the continuing claims doctrine . . . .").

Defendant makes only one argument outside of the framework of the continuing claims doctrine to explain how plaintiff's second claim for relief relates back to the original alleged taking in 1999.  Defendant contends that any finding that the failure of the subsurface drain constitutes a new cause of action would be contrary to the Chief Judge's earlier decision in Forsgren I.  Def.'s Reply Mem. Supp. Its Mot. Dismiss 17.  In particular, defendant argues that the Chief Judge "did not find that a new cause of action accrued after each mitigation measure failed."  Id. (citing Forsgren I, 64 Fed. Cl. at 460).  What defendant overlooks, however, is that none of the other attempts to halt the flooding of plaintiff's property resulted in stabilization such that an accrual date could be determined.  See Compl. ¶¶ 38-53.  Stabilization was only achieved because of the installation of the subsurface drain, and the subsurface drain functioned properly by protecting plaintiff's property for over five years.  Thus, the previous unsuccessful mitigation measures are not relevant.

At this stage of the litigation, the court finds that plaintiff, in its second claim for relief, sufficiently alleges a cause of action within the statute of limitations.  Because the court must construe the allegations in the complaint in plaintiff's favor, Henke, 60 F.3d at 797, it construes plaintiff's complaint to allege that the initial purported Fifth Amendment taking had been resolved by the installation of the subsurface drain in 1999 with the restoration of the condition of plaintiff's property, and that over five years later, with the failure of the subsurface drain, a new and distinct Fifth Amendment taking occurred, causing new damage beyond the damage previously sustained.  In other words, plaintiff alleges that defendant's decision to install and maintain the subsurface drain constituted an abandonment of the original water flowage easement, and the subsequent failure of the subsurface drain triggered a new taking.  Accordingly, at this time, the court will not dismiss plaintiff's claim on statute of limitations grounds.

## 2. Plaintiff Has Set Forth Sufficient Allegations to State a Claim for a Fifth Amendment Taking Over Which This Court Has Jurisdiction

In its motion to dismiss, defendant also argues that the allegations set forth in plaintiff's second claim for relief do not constitute a Fifth Amendment taking.  Mot. 16-18.  In its second claim for relief, plaintiff contends that the government's failure to maintain the subsurface drain, contrary to its purported promise to do so, resulted in the renewed flooding of its property.  Compl. ¶¶ 98-105.  According to defendant, plaintiff failed to identify, as required, an affirmative

government act on which to base the Fifth Amendment taking.[8]  Mot. 16-18.  In response, plaintiff asserts that government inaction is sufficient to constitute a Fifth Amendment taking and that, in any event, the government's deliberate decision not to maintain the subsurface drain constitutes an affirmative act.  Opp'n 22-27.  Plaintiff does not dispute that defendant's argument raises a jurisdictional issue.  See id. at 20.  The court finds, however, that defendant's argument that plaintiff has failed to allege facts supporting a takings claim is not properly raised in a motion to dismiss.  Cf. Nicholson v. United States, 77 Fed. Cl. 605, 615 (2007) (deciding to analyze whether plaintiffs' claims constituted torts or Fifth Amendment takings in the context of a motion for summary judgment); Bagwell v. United States, 21 Cl. Ct. 722, 726 (1990) (finding a lack of sufficient evidence to determine whether plaintiffs were alleging torts or Fifth Amendment takings and therefore a determination regarding the court's subject matter jurisdiction was not possible).

The Federal Circuit has instructed that when engaging in a jurisdictional analysis, a court must first determine whether plaintiff has alleged a money-mandating constitutional provision, statute, or regulation.  Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc portion).  Then, "[i]f the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course."  Id.  However, the decision in Fisher is silent as to whether a claim must also be nonfrivolous.  Two subsequent decisions from the Federal Circuit address this issue.

In Moden v. United States, plaintiffs alleged a Fifth Amendment taking stemming from the government's purported contamination of groundwater.  404 F.3d 1335, 1338-39 (Fed. Cir. 2005).  In applying Fisher's holding, the Federal Circuit observed that there was no dispute that the Fifth Amendment was money-mandating.  Id. at 1341.  However, the court concluded that Supreme Court precedent also required, as a jurisdictional prerequisite, a determination that plaintiffs' claim was not frivolous.  Id. at 1340-41.  As explained by the court, in Steel Co., the Supreme Court held that "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'"  523 U.S. at 89 (quoting Oneida Indian Nation of N.Y. v. County of Oneida, N.Y., 414 U.S. 661, 666 (1974)).  Thus, according to the Federal Circuit, "to the extent that [plaintiffs] have a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper."  404 F.3d at 1341.  The court then noted that defendant did not argue that plaintiffs' claim was frivolous and that it was clear that plaintiffs'

---

[8]  As an aside to its argument, defendant suggests that plaintiff's allegations may instead constitute a tort.  Mot. 2, 17.  Despite the perfunctory nature of defendant's assertion, plaintiff responds to it fully in its opposition.  Opp'n 27-33; Pls.' Responsive Supplemental Br. (Sept.) 5-6.  As noted infra, the Federal Circuit and the Court of Federal Claims have previously concluded that the analysis of whether a plaintiff has alleged a Fifth Amendment taking or, alternatively, a tort, should not be performed in the context of a motion to dismiss for lack of jurisdiction.

claim was "not made solely for the purpose of obtaining jurisdiction." Id.  Accordingly, the court concluded that it had jurisdiction to reach the merits of plaintiffs' case because plaintiffs' claim was "neither frivolous, nor so insubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid of merit as not to involve a federal controversy." Id. at 1341-42.

Recently, the Federal Circuit again addressed whether the exercise of this court's jurisdiction was dependant upon a plaintiff's assertion of a nonfrivolous claim.  In Jan's Helicopter Service, Inc. v. FAA, plaintiffs alleged a Fifth Amendment taking arising from government actions that forced plaintiffs to cease their business operations.  Nos. 2007-1410, 2007-1411, 2008 WL 1700404, at *1 (Fed. Cir. Apr. 14, 2008).  As an initial matter, the court held that the jurisdictional requirement of a nonfrivolous claim, as set forth in the Supreme Court's decision in Steel Co., did not apply to complaints filed in the Court of Federal Claims:

> Steel Co. and other Supreme Court cases recognizing . . . a [substantial federal question] requirement involved situations where jurisdiction was founded on the "arising under" language of Article III, U.S. Const. art. III, § 2, cl. 1, which, in turn, is reflected in the "arising under" language of 28 U.S.C. § 1331.  There is no such limit on the jurisdiction of the Court of Federal Claims, which does not depend on the "arising under" clause of Article III or section 1331, but rather on a separate clause in Article III that authorizes jurisdiction over all "controversies to which the United States is a party," U.S. Const. art. III, § 2, cl. 1, and on 28 U.S.C. § 1491(a)(1), which confers jurisdiction on the Court of Federal Claims for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department."  We are not aware of any Supreme Court authority that controversies falling under the "founded upon" language of 28 U.S.C. § 1491(a)(1) require a showing of nonfrivolousness.

Id. at *4 (footnotes omitted).  Instead, citing its recent decision in Greenlee County, Ariz. v. United States, the court held that a plaintiff need only show that it "has made a nonfrivolous assertion that it is within the class of plaintiffs entitled to recover under the money-mandating source . . . ."  Id. at *6 (citing 487 F.3d 871, 876 & n.2 (Fed. Cir. 2007)).  The court's holding was clear:

> In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source.  There is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits.

Id. at *7.  Addressing the dissenting judge's assertion that its holding was inconsistent with Moden,[9] see id. at *9, the court explained that it did not "read Moden . . . as determining that a plaintiff's claim as a whole must be nonfrivolous to establish Tucker Act jurisdiction," but instead "as holding that the plaintiff must make a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source of law."  Id. at *6 n.9.  Further, the court labeled the relevant "statements" in Moden as dicta because "the court did not consider the possibility that under Fisher a nonfrivolous allegation on the merits of the claim was not required."[10]  Id.  Thus, upon noting that the Takings Clause of the Fifth Amendment is money-mandating and that plaintiffs, "having alleged a taking of their property by the government, [we]re within the class of plaintiffs entitled to recovery if a takings claim [wa]s established," the court held that the Court of Federal Claims had jurisdiction to decide the merits of plaintiffs' case.  Id. at *7.

Thus, the Federal Circuit has reached two seemingly different conclusions concerning what plaintiff needs to show to establish jurisdiction in the Court of Federal Claims.  Here, the court need not determine which approach is controlling, as plaintiff's second claim for relief survives under both.  First, both approaches, in accord with the en banc decision in Fisher, require plaintiff to base its claim on a money-mandating source of law.  Plaintiff, by alleging a taking under the Fifth Amendment, has satisfied this requirement.  In addition, if the court applied the approach set forth in Jan's Helicopter Service, Inc., there is no question that by alleging a taking of its property by the government, plaintiff "has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source."

Furthermore, if the court applied the approach set forth in Moden, it would find that plaintiff's second claim for relief is not frivolous.  The Fifth Amendment prohibits the taking of

---

[9]  The dissenting judge in Jan's Helicopter Service, Inc. was the author of the unanimous decision in Moden.

[10]  Although the dissenting judge agreed with the majority that the Court of Federal Claims had jurisdiction over plaintiffs' claims, 2008 WL 1700404, at *8 (Prost, J., dissenting), she took issue with the majority's treatment of Moden:

> First, I simply disagree with the majority's reading of Moden.  It does not confine the nonfrivolous claim requirement to a "class of plaintiffs" analysis.  Second, contrary to the suggestion by the majority, the Moden court expressly addresses Fisher in the portion of the opinion discussing the nonfrivolous claim requirement for jurisdiction.  The Moden court determined that jurisdiction was proper because a nonfrivolous claim was asserted, noting that the Fisher court's jurisdictional discussion addresses another issue (i.e., how to determine whether a source is money-mandating).

Id. at *9.

private property for public use without paying just compensation.  U.S. Const. amend. V.  To establish that a Fifth Amendment taking has occurred, plaintiff must show that it has a valid property interest and that the government's action "'amounts to a compensable taking of that property interest.'"  Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212-13 (Fed. Cir. 2005) (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004)).  Although defendant argues that "[t]he Fifth Amendment . . . specifically calls for a defined government 'action' as the basis for any takings claim, and a failure to act is, by definition, not such an action," Mot. 17, it has not cited to any binding precedent directly supporting this proposition that would render plaintiff's claim patently frivolous.  Instead, defendant cites several decisions from the Court of Federal Claims and its predecessor court, the United States Claims Court ("Claims Court") in support of its argument.  Id.; see also Def.'s Supplemental Br. Pursuant Court's Order Aug. 15, 2007, at 2-6 (applying the recent decision in Nicholson to the instant case).  All but one of these cases fail to address the distinction between government action and inaction, and in the one case that does address this issue, the court treats it as a merits inquiry and not a jurisdictional inquiry.  Thus, the court finds these decisions inapposite.

First, in two of the cases cited by defendant, the issue facing the court was whether the federal government, by providing funding or issuing block grants to a state, was liable under the Fifth Amendment for the actions of the state taken to implement state and federal law.  In Pendleton v. United States, plaintiffs alleged that actions taken by the Commonwealth of Kentucky, using federal funding provided pursuant to the Surface Mining Control and Reclamation Act of 1977, constituted a Fifth Amendment taking of their property.  47 Fed. Cl. 480, 481-83 (2000).  After noting that "the federal government's role . . . [wa]s limited to establishing standards and regulations, approving grant contracts, and inspecting and paying for the work," and that the Commonwealth of Kentucky "defined the scope of the work, solicited bids, negotiated the contract terms, and hired the contractors to perform the work," the court held:

> In our federal system, it is not uncommon for federal and state governments jointly to be involved in actions directed at improving the public welfare.  When these actions give rise to potential liability under the Fifth Amendment's takings clause, it is necessary for the courts to determine whether the federal government, the state, or both should be deemed the responsible party.  . . . [T]he affirmative acts complained of here were actions of the state and not the federal government. . . .  The federal government's involvement . . . simply is not sufficient to support a takings claim under the Fifth Amendment.

Id. at 485.  In B & G Enterprises, Ltd. v. United States, plaintiff alleged that the federal government's provision of block grants to the State of California pursuant to the Alcohol, Drug Abuse and Mental Health Organization Act, which resulted in California passing a law severely restricting the acceptable locations for cigarette vending machines, including plaintiff's own vending machines, constituted a Fifth Amendment taking.  43 Fed. Cl. 523, 524 (1999).  The court found that prior precedent established that "the Government must take some affirmative

action for a takings claim to be successful," noting that "[t]he United States cannot be held liable if private property is taken by acts or omissions of the state." Id. at 526-27.  It is clear that the courts in Pendleton and B & G Enterprises, Ltd. were concerned with whether it was the state government or the federal government that took the relevant action or made the relevant omission, and not with the distinction between action and inaction.

Defendant also cites to Alost v. United States, a case concerning the government's alleged taking of a water flowage easement over plaintiffs' land without just compensation.  73 Fed. Cl. 480, 481 (2006).  The central issue in this case, however, was not the nature of the government's action or inaction, but was instead whether the government's action "directly and proximately caused more frequent flooding or flooding of a longer duration than that which occurred prior to the [action]."[11]  Id. at 495.  The court cited the decision of the Court of Claims in Barnes v. United States for the proposition that

> a plaintiff seeking to establish a government taking of an easement by flooding must demonstrate not only that the flooding is intermittent, frequent, and inevitably recurring, it must also demonstrate that there was a "governmental act, the natural and probable consequences of which effect such an enduring invasion of plaintiffs' property as to satisfy all other elements of a compensable taking."

Id. (quoting 538 F.2d 865, 870-71 (Ct. Cl. 1976)) (citations omitted).  Again, as with Alost, the court in Barnes was not concerned with an allegation of government inaction.  See 538 F.2d at 569 ("It is not open to doubt upon this record that the underlying cause of the flooding is the control, storage and regulation of the flow of the Missouri River by the construction and operation of the main stem reservoir system of the Missouri River . . . .").  Thus, neither Alost nor Barnes forecloses plaintiff's claim in the instant case.

Defendant also relies upon the recent decision of the Court of Federal Claims in Nicholson.  The plaintiffs in Nicholson alleged that the "Government's failure to adequately design, build, or maintain certain levees in New Orleans before and after Hurricane Katrina[] result[ed] in a permanent loss of value to their properties."  77 Fed. Cl. at 605.  The court did discuss the requirement of an affirmative government act, finding that the Court of Federal Claims "has consistently required that an affirmative action on the part of the Government form the basis of the alleged taking," id. at 620, but only after determining that such a discussion was more appropriate in the context of a motion for summary judgment, id. at 615.  The litigation in the instant case has not yet reached that stage.

---

[11]  Here, too, plaintiff can reasonably argue that the government's decision not to maintain the subsurface drain–installed specifically to drain water from plaintiff's property and prevent future inundations–is an affirmative act that had the natural and probable effect of an "intermittent, frequent, and inevitably recurring" flooding of plaintiff's property.

-17-

Finally, the remaining case relied upon by defendant is unavailing for several reasons.  In Last Chance Mining Co. v. United States, plaintiff argued that the government's failure to record plaintiff's mining claims, as required by statute, constituted a Fifth Amendment taking.  12 Cl. Ct. 551, 554 (1987).  While the court did note that there was no precedent supporting plaintiff's position that "the inaction of a regulatory body in carrying out its statutory duty" could be a Fifth Amendment taking, it found that "the one common denominator in cases finding a taking is that there was a public purpose animating some affirmative action or statement . . . ." Id. at 556.  The court also opined that it was possible for "a negligent act" to "constitute action" to the extent that "the alleged results of inaction were . . . intended []or a direct appropriation, confiscation, or invasion." Id. at 557 n.7.  The first notable distinction between Last Chance Mining Co. and the instant case is that there is no evidence that plaintiff in the instant case is alleging a failure to perform a statutory duty.  Rather, plaintiff argues that the government failed to maintain the measure that halted the initial alleged taking of its property.  Further, plaintiff in the instant case has alleged a "statement" by the government–that the government promised to maintain the subsurface drain–that may support a Fifth Amendment taking.  Cf. Illinois v. United States, 19 Cl. Ct. 180, 186 (1989) (holding that when the government promises to maintain certain bridges as consideration in a condemnation action, a failure to maintain those bridges constitutes a Fifth Amendment taking).  Finally, the court in Last Chance Mining Co. entertained the possibility of a Fifth Amendment taking by government inaction in appropriate circumstances.

In addition to its own reliance upon Last Chance Mining Co., plaintiff cites binding precedent in support of its contention that government inaction can support a Fifth Amendment taking.  In United Nuclear Corp. v. United States, plaintiff leased land on the Navajo Reservation to conduct uranium mining.  912 F.2d 1432, 1433 (Fed. Cir. 1990).  Upon discovering "valuable uranium deposits" on the land, plaintiff prepared a mining plan that it submitted to the Secretary of the Interior for the required approval.  Id.  "Although [plaintiff]'s mining plan satisfied all of the requirements of the Secretary's regulations, the Secretary refused to approve it without tribal approval." Id.  The Federal Circuit held that the Secretary's refusal to approve, without tribal consent, a fully compliant mining plan constituted a Fifth Amendment taking.  Id.  But see id. at 1437-38 (characterizing the government "action" as the decision to require tribal consent of plaintiff's mining plan).  Further, even though the Federal Circuit reversed the Claims Court's merits ruling, id. at 1438, it did not take issue with the Claims Court's pronouncement that "[g]overnmental regulatory inaction can also constitute a taking," see United Nuclear Corp. v. United States, 17 Cl. Ct. 768, 774 (1989) (citing cases from the United States Courts of Appeals for the First, Third, Fifth, and Sixth Circuits), rev'd on other grounds, 912 F.2d at 1432.  Because United Nuclear Corp. concerned a taking based upon regulatory inaction and was not a physical takings case, it is distinguishable from the instant case.  However, the reasoning is sufficient to defeat a charge of frivolity.  Further analysis regarding whether plaintiff's allegations amount to a Fifth Amendment taking is inappropriate at this stage.

## IV.  CONCLUSION

For the reasons set forth above, the court **GRANTS** plaintiff's motion to voluntarily withdraw its first claim for relief and **DISMISSES** plaintiff's first claim for relief without prejudice.  The court **DENIES AS MOOT** defendant's motion to dismiss with respect to plaintiff's first claim for relief and **DENIES** defendant's motion to dismiss with respect to plaintiff's second claim for relief.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge